**DISTRICT OF COLUMBIA, Donna
Wilson, Esquire, and Bernard
Anderson, M.D., Appellants,**

v.

**Cuthbert O. SIMPKINS, M.D., Appellee.**

No. 96–CV–250.

District of Columbia Court of Appeals.

Argued Feb. 18, 1998.
Decided Nov. 12, 1998.

Justin Draycott, Assistant Corporation Counsel, with whom Jo Anne Robinson, Interim Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellants.

Barry Coburn, Washington, DC, for appellee.

Before WAGNER, Chief Judge, and TERRY, Associate Judge, and GALLAGHER, Senior Judge.

GALLAGHER, Senior Judge:

This is an interlocutory appeal[1] by the District of Columbia, Bernard Anderson, M.D., and Donna Wilson, Esquire, from a trial court judgment declining to dismiss defamation claims brought against them by appellee, Dr. Simpkins, a former physician at the District of Columbia General Hospital ("the Hospital").[2]

The proceeding revolves around a charge by Dr. Simpkins that Donna Wilson, while General Counsel for the Hospital, defamed

---

1. This appeal invokes the collateral order appellate exception to the finality requirement of D.C.Code § 11–721(a)(1) (1995); *Durso v. Taylor,* 624 A.2d 449, 451 n. 1 (D.C.1993).

2. This proceeding has had an unusually extensive procedural history. The original proceeding was first removed from the Superior Court to the United States District Court as the United States had been named as a party. The proceeding was eventually remanded by the United States Court of Appeals to the Superior Court, where the order now under review was entered.

him by improperly submitting a report to the National Practitioner Data Bank ("the Data Bank") asserting that Dr. Simpkins had resigned from the Hospital while his surgical capabilities were under review. Secondly, Dr. Simpkins charged defamation by Dr. Anderson (then Chief of Surgery), based on comments made in memoranda to other Hospital officials concerning Dr. Simpkins' clinical competence. The information contained in Dr. Anderson's memoranda had provided the basis for the report submitted by Donna Wilson to the National Practitioner Data Bank.

## I.

During 1991 and 1992, appellant Dr. Anderson served as Chief of Surgery at the Hospital. In that capacity, Dr. Anderson had supervisory authority over appellee Dr. Simpkins, who was an attending physician. In a memorandum dated March 28, 1991, Dr. Anderson wrote to Anthony Jean–Jacques, M.D., who was Dr. Simpkins' Section Chief within the Department of Surgery, indicating that he had concerns regarding Dr. Simpkins' clinical judgment and competence. Dr. Anderson concluded the memorandum by requesting that he, along with Dr. Jean–Jacques and Dr. Simpkins, meet to formally discuss his concerns. He also requested that Dr. Jean–Jacques, as Section Chief, review Dr. Simpkins' work to determine whether his clinical privileges needed an adjustment.

In response to Dr. Anderson's memorandum, Dr. Jean–Jacques recommended in a letter dated May 30, 1991, that Dr. Simpkins' cases be monitored for six months and that Dr. Simpkins be encouraged to consult with his supervisors when he considered it necessary. The letter also advised that at the end of the six-month review period, further recommendations would follow. While the let-

**3.** In his brief, Dr. Simpkins asserts that he resigned without knowledge of Dr. Jean–Jacques' written recommendations to Dr. Anderson.

**4.** 42 U.S.C. § 11133 (1995); *see also* 45 C.F.R. § 60.9 (1997).

**5.** In his complaint, appellee alleged that he did not become aware of the Hospital's submission to the Data Bank until June 1992. The submitted report provided:

ter indicated that the recommendations were to take effect on June 17, 1991, Dr. Simpkins alleges that the recommendations were conditioned upon Dr. Anderson agreeing to them, and that there is no documentation evidencing such an agreement. On June 3, 1991, Dr. Simpkins submitted his resignation to the Hospital, citing substandard management and patient care as his reasons for leaving.[3]

On July 11, 1991, Donna Wilson, Esquire, then of the Hospital's Office of Legal Counsel and Risk Management, informed Dr. Simpkins that she would be reporting his resignation to the Data Bank pursuant to the mandates of the Health Care Quality Improvement Act of 1986 ("HCQI Act").[4] In a letter to Ms. Wilson dated July 22, 1991, counsel for Dr. Simpkins questioned the basis for the assertion that the law required Ms. Wilson to report Dr. Simpkins' resignation to the Data Bank. The letter also requested, among other things, that Dr. Simpkins be permitted to review any proposed report to the Data Bank prior to its submission.

On September 3, 1991, Dr. Simpkins filed a grievance with the Chairman and the Medical Director of the Hospital objecting to Ms. Wilson's proposed submission to the Data Bank. He argued that the purported review and recommendations made by Dr. Jean–Jacques did not constitute "an investigation" by the Hospital within the meaning of the HCQI Act. He further argued that his voluntary resignation did not constitute "a surrender of clinical privileges of a physician" under the statute. On October 4, 1991, the Hospital reported Dr. Simpkins' resignation to the Data Bank, and the report referred to comments made by Dr. Anderson in memoranda to Dr. Jean–Jacques concerning Dr. Simpkins' competence.[5]

*Section C: Reported Adverse Action Information*

| | |
|---|---|
| Date of Action: | 06/17/91 |
| Adverse Action Code: | 638.02 Incompetence/<br>Malpractice/Negligence |
| Length of Action: | Permanent |
| Effective Date: | 10/04/91 |

Acts/Omissions Description:
Cuthbert Simpkins, M.D. resinged [sic] from position as attending physician in department

## II.

Appellants contend that the report submitted to the Data Bank regarding Dr. Simpkins' resignation was absolutely privileged. Specifically, Ms. Wilson asserts that because she exercised a mandatory duty pursuant to the HCQI Act, absolute immunity shields her conduct. Dr. Anderson, on the other hand, argues that his immunity derives from discretionary actions taken within the outer perimeter of his official duties.

■ This court has recognized that a District of Columbia government official is entitled to absolute immunity when performing an act required by law. *See District of Columbia v. Thompson,* 570 A.2d 277, 293 (D.C. 1990);[6] *see also Goggins v. Hoddes,* 265 A.2d 302, 303 (D.C.1970) (absolute privilege for report required by law to be filed with unemployment compensation board). We have also held that absolute immunity shields an official's conduct when such conduct was "(1) ... within the 'outer perimeter' of his official duties, and (2) the particular government function at issue was 'discretionary' as opposed to 'ministerial.'" *Moss, supra,* note 6, 580 A.2d at 1020 (citing *Thompson, supra,* 570 A.2d at 294 & n. 14). Accordingly, whenever a government official's conduct meets the test for absolute privilege based on the performance of an official mandatory or discretionary duty, no claim for defamation may be premised on statements published in the exercise of that duty.

### A. Ms. Wilson's Mandatory Duty

In determining whether the law required Ms. Wilson to report Dr. Simpkins' resigna-

of surgery effective June 17, 1991 citing: " ... the level of patient care and the level of management do not meet my standards ...''. Prior to resignation, chief of surgery had requested a review of quality of care rendered by Dr. Simpkins be conducted by Cheif [sic] of General Surgery section[.] Request for review had been precipitated by findings via hospital and departmental QA of potential serious adverse outcomes of two cases of Dr. Simkins [sic]. Report of section chief received by department chief May 30, 1991.

6. This court vacated certain rulings in *District of Columbia v. Thompson, supra,* in a subsequent appeal from a remand in *District of Columbia v. Thompson,* 593 A.2d 621 (D.C.1991). However, we adopted the immunity analysis in *Thompson,*

tion to the Data Bank, we turn to 42 U.S.C. § 11133(a) of the HCQI Act. Under this provision, a health care entity which

(B) accepts the surrender of clinical privileges of a physician—

(i) while the physician is under an investigation by the entity relating to possible incompetence or improper professional conduct, or

(ii) in return for not conducting such an investigation or proceeding; ...

. . . .

shall report to the Board of Medical Examiners ... information described in paragraph (3).[7]

42 U.S.C. § 11133(a). Failure to follow the directives of this section subjects the health care entity to sanctions. *See* 42 U.S.C. § 11133(c).

Dr. Simpkins argues that the HCQI Act does not afford Ms. Wilson absolute immunity principally because no report was required under the Act as he resigned his employment from the Hospital, as contrasted with surrendering his privileges, and he was not "under investigation" when he left his employment. He further asserts that, in any case, the Hospital was required to submit the report to the Board of Medical Examiners, not the Data Bank. Ms. Wilson, on the other hand, contends that Dr. Simpkins' resignation, which amounted to a surrender of clinical privileges as contemplated by the statute, occurred while he was under investigation by the Hospital for possible incompetence and improper professional conduct. Thus, she

*supra,* 570 A.2d 277, as sound. *See Moss v. Stockard,* 580 A.2d 1011, 1018 n. 12 (D.C.1990).

7. Paragraph (3) provides:

The information to be reported under this subsection is—
(A) the name of the physician or practitioner involved
(B) a description of the acts or omissions or other reasons for the action or, if known, for the surrender, and
(C) such other information respecting the circumstances of the action or surrender as the Secretary deems appropriate.
42 U.S.C. § 11133(a)(3).

asserts, this set of circumstances fell within the reporting requirements of the HCQI Act.

■ The present record does not enable this court to determine whether Dr. Simpkins' resignation was tantamount to a surrender of privileges, nor are we able to discern whether Dr. Simpkins was "under investigation," as contemplated by the HCQI Act, at the time of his resignation. Further, even if Dr. Simpkins was under investigation, as matters stand, we cannot determine from the record the point at which the correspondence between Dr. Anderson and Dr. Jean–Jacques became a formal investigation of Dr. Simpkins. This determination is critical, particularly since there is a dispute as to whether Dr. Anderson was required to give his approval of Dr. Jean–Jacques' recommendations regarding review of Dr. Simpkins' alleged improprieties. Therefore, we must remand this case to the trial judge for further proceedings.

### B. Dr. Anderson's Discretionary Duty

■ To determine whether Dr. Anderson's connection to the report submitted to the Data Bank should be afforded absolute immunity, we analyze his actions in the context of our two-prong "discretionary duty" test. Specifically, we must determine whether Dr. Anderson's conduct (1) was within the outer perimeter of his official duties, and (2) was discretionary as opposed to ministerial. *Moss, supra* note 6, 580 A.2d at 1020 (citing *Thompson, supra,* 570 A.2d at 294 & n. 14).

In *Moss,* this court noted that "[d]etermining whether an act fell 'within the outer perimeter of the [official's] line of duty,' *Barr v. Matteo,* 360 U.S. 564, 575, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), calls for a relatively straight-forward identification of the act giving rise to the suit and an analysis of the official's proper functions and duties." *Moss, supra* note 6, 580 A.2d at 1020.

■ Distinguishing between discretionary and ministerial functions, however, involves a more discerning inquiry which seeks to determine whether the government action at issue allows a sufficiently significant appli-

cation of discretion "to justify official immunity, in order to assure 'fearless, vigorous, and effective' decisionmaking." *Id.* (quoting *Thompson, supra,* 570 A.2d at 297). Each case requires the court, as a matter of law, to balance the contending interests and determine if society's concern requires subordinating the vindication of private injuries otherwise compensable at law to the particular government conduct at issue in order to avoid the disruptive effects of civil litigation. *Id.* 580 A.2d at 1020–21.

■ We employ four policy factors to aid in our task of distinguishing discretionary from ministerial functions: "(1) the nature of the injury, (2) the availability of alternate remedies, (3) the ability of the courts to judge fault without unduly invading the executive's function, and (4) the importance of protecting particular kinds of acts." *Id.* at 1021. Further, this inquiry must necessarily recognize the tenet that the "scope of immunity should be no broader than necessary to ensure effective governance." *Id.* (citing *Westfall v. Erwin,* 484 U.S. 292, 298–99, 108 S.Ct. 580, 98 L.Ed.2d 619 (1988)).

■ Looking at the applicable policy factors, we recognize that to the extent Dr. Simpkins' injuries from the alleged defamation are economic, and not physical, the first factor "arguably cut[s] against [Dr. Anderson's] liability." *Thompson, supra,* 570 A.2d at 297. With regard to the remaining factors, however, we cannot discern from the record whether Dr. Simpkins had some alternative administrative remedies through the District of Columbia Comprehensive Merit Personnel Act[8] which could provide adequate redress; whether Dr. Anderson's actions reflect routine supervisory conduct or policy choices within his discretion; and whether Dr. Anderson's conduct reaches the level of importance which warrants protection from a civil action for defamation. *Id.* at 298. "In short, absent further trial court findings as to the applicable policy factors, we cannot say as a matter of law whether [Dr. Anderson] ha[s], or ha[s] not, carried [his] burden of sustaining absolute immunity." *Id.*

---

**8.** D.C.Code §§ 1–601.1 to –637.2 (1992 & 1997 Supp.).

Accordingly, just as we are remanding Ms. Wilson's claim of absolute immunity for further findings, we also remand concerning Dr. Anderson's claim of absolute immunity to allow the trial judge the opportunity to properly "weigh the pertinent factors and discern where the appropriate balance of interests lies." *Moss, supra* note 6, 580 A.2d at 1021.[9] Specifically, in following the guidelines we set out in *Moss:*

> [t]he judge should: (1) ascertain whether [Dr. Anderson's] communications to [Dr. Jean–Jacques] fell within the "outer perimeter" of his official duties, and (2), based upon findings on the policy factors identified above, as well as others the judge deems relevant, decide whether those acts involved the exercise of a choice whose contribution to effective government outweighs the harm to plaintiff that would result from application of official immunity—thus making the acts "discretionary" within the meaning of *Thompson.*

*Id.* at 1021–22.

### III.

Appellants also contend that the trial court erred by not finding that the District of Columbia Comprehensive Merit Personnel Act ("DCCMPA")[10] provides the exclusive process and remedy for Dr. Simpkins' defamation action. Appellants also suggest that the doctrine of pendent jurisdiction allows this court to review this issue.

■ "This court has jurisdiction over final orders, *see* D.C.Code § 11–721(a)(1) (1995), and over certain interlocutory orders specified by statute, *see id.* § 11–721(a)(2), (3), by court rule, Super. Ct. Civ. R. 54(b), and by the 'collateral order' doctrine, *see Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949); *In re Estate of Chuong,* 623 A.2d 1154, 1157 (D.C.1993) (en banc) (collecting cases)." *Francis v. Recycling Solutions, Inc.,* 695 A.2d 63, 80 (D.C.1997). Also, this court may exercise pendent appellate jurisdiction to review an otherwise nonfinal, nonappealable issue.

Here, the trial court's order is not a final judgment, since the charges against Ms. Wilson and Dr. Anderson "are still pending, and no ultimate judgment on the merits has been entered." *Stein v. United States,* 532 A.2d 641, 643 (D.C.1987), *cert. denied,* 485 U.S. 1010, 108 S.Ct. 1477, 99 L.Ed.2d 705 (1988). Further, whether the DCCMPA is Dr. Simpkins' exclusive remedy is a question not reviewable by court rule, *see* Super. Ct. Civ. R. 54(b), or as an interlocutory order that is reviewable pursuant to D.C.Code §§ 11–721(a)(2) to (3).

■ With regard to the collateral order doctrine, "a narrow but well-recognized exception to the rule against appeals from nonfinal orders," *In re Estate of Chuong, supra,* 623 A.2d at 1157 (quoting *Stein, supra,* 532 A.2d at 643), precludes this court from reviewing the DCCMPA question under this doctrine. To be appealable under this doctrine, a trial court's order must,

> [f]irst, . . . conclusively determine the disputed question; second, it must resolve an important issue completely separate from the merits of the action; third, it must be effectively unreviewable on appeal from a final judgment.

*Id.* (quoting *Flanagan v. United States,* 465 U.S. 259, 265, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984)) (citation and internal quotations omitted).

Of the three requirements which must be met, the DCCMPA issue satisfies only one of them. Specifically, while the question of primary jurisdiction is an important issue completely separate from the merits of this action, the record indicates that the trial court has not conclusively ruled on it. Additionally, the court's ultimate determination on this issue "can be reviewed as effectively on ap-

---

**9.** In *Thompson, supra,* 570 A.2d at 298, we held that the record on appeal was insufficient for us to determine whether, based on the applicable policy factors, appellants had met their burden of proving absolute immunity. We reached a similar conclusion in *Moss, supra,* 580 A.2d at 1021. In both cases, a full trial had been conducted and jury verdicts reached. Here, Dr. Simpkins—the nonmovant in this case—has not even had the benefit of discovery when appellants' motion to dismiss was filed.

**10.** See note 8, *supra.*

peal of a final judgment as on an interlocutory appeal," *In re Estate of Chuong, supra,* 623 A.2d at 1158 (citation omitted), without jeopardizing the propriety of any administrative action under the DCCMPA.[11]

Lastly, in *Francis, supra,* this court noted three criteria for determining whether it could exercise pendent jurisdiction: (1) whether the nonappealable issue is *inextricably intertwined* with the immediately appealable issue, *see Swint v. Chambers County Comm'n,* 514 U.S. 35, 51, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995); (2) whether review of the nonappealable issue would be necessary to ensure meaningful review of the appealable issue, *see id.;* and (3) whether the nonappealable issue is so closely related to the appealable issue, " 'or turn[s] on such similar issues, that a single appeal should dispose of both simultaneously' and, in some cases, [would] terminate the entire proceeding without a second appeal," *Gilda Marx, Inc. v. Wildwood Exercise, Inc.,* 318 U.S.App.D.C. 109, 113, 85 F.3d 675, 679 (1996); *Francis, supra,* 695 A.2d at 81 (quoting *Gilda Marx, supra,* 318 U.S.App.D.C. at 113, 85 F.3d at 679). Thus, absent the necessary overlap, where either the nonappealable or the appealable issue virtually determines the result of the other, pendent appellate jurisdiction will not be available. *See id.* at 83.

In *Gilda Marx, supra,* the court

warned against taking pendent appeals that meet even one of [the three] criteria ... [when] the record on appeal would be inadequate for review, or the trial court had not had an opportunity to render a considered decision on the collateral order, or the issue might be mooted or altered by subsequent trial court proceedings, or the pendent appeal would predominate over a relatively insignificant, though independently appealable, order.

*Francis, supra,* 695 A.2d at 81 (quoting *Gilda Marx, supra,* 318 U.S App.D.C. at 113, 85 F.3d at 679) (internal quotations omitted).

On the facts before us, pendent appellate jurisdiction is not available. In the first place, as previously mentioned, the rec-

ord is inadequate for review. Also, if the trial court, after further proceedings, determines that Ms. Wilson and Dr. Anderson are absolutely immune from liability, this would not determine whether the DCCMPA is the exclusive procedure and remedy for Dr. Simpkins' claim; therefore, the issues are not inextricably intertwined. Further, review of the DCCMPA issue is not necessary to ensure meaningful review of whether Ms. Wilson or Dr. Anderson are entitled to absolute immunity, although the immunity issue might be mooted if the trial court decides that the DCCMPA is, in fact, the exclusive procedure and remedy for Dr. Simpkins' claim. Moreover, because substantial considerations of fairness or judicial economy would not be served by appellate review of this DCCMPA issue, *see Francis, supra,* we conclude that an exercise of pendent jurisdiction is not warranted.

**IV.**

For the foregoing reasons, this case is remanded to the trial court for further proceedings consistent with this opinion.

*So ordered.*

---

11. In *Thompson, supra,* 593 A.2d 621, this court reviewed the trial court's final judgment to determine whether the supervisor's conduct at issue fell within the scope of the DCCMPA.